# Peterson *versus* Speer.

The certificate of discharge granted to a bankrupt by a federal court, under the Act of Congress of 19th August, 1841, is a complete and conclusive discharge from all debts existing prior to the application, unless the same shall be impeached for some fraud, or concealment of his property by the bankrupt, contrary to the provisions of the act.

When a certificate of discharge is so impeached, any other court, in which the question may arise, possesses the same power to try the impeachment, as the court decreeing the bankruptcy possessed to try the right to the certificate.

The same fraud or concealment of property, which would, if interposed, have prevented the bankrupt court from decreeing a discharge, will render the certificate unavailing as a discharge from prior indebtedness, when subsequently shown in a state court.

On a trial of a cause, in which the bankrupt certificate is set up as a discharge from the debt by the defendant, and impeached for fraud and concealment of property by the plaintiff, the proceedings of the bankrupt court, under which certain real estate alleged to be fraudulently omitted from the schedule by the bankrupt, was sold by the assignee,—an ejectment against the defendant in possession by the purchaser at such sale, and a compromise made of the case are evidence, as part of the *res gestæ.*

[Peterson v. Speer.]

It is not a valid objection to the proceedings in the federal court, that the assignee set forth in his petition, on an order to sell, that "he had *been informed*" that the bankrupt had an interest in the premises, and that he did not expressly aver that he had such interest.

Such proceedings were not evidence of the title of the bankrupt, but, in connexion with other competent evidence, were circumstances to be submitted to the jury, on the question of fraud and concealment of his property.

Where a deed of real estate was made in fraud of creditors, prior to the passage of the bankrupt act, and such estate omitted from the schedule, the fraud upon the act consisted not in making the deed, but in omitting to return the property.

Any concert or collusion between parties to a fraudulent transaction, makes the declarations of one evidence against the other; and it is not necessary that the person whose declarations are offered should have been a party to the original concoction of the fraud, if he, after full knowledge that it was committed, attempts to reap the benefits of the fraudulent transaction.

Although the court below erred in the admission of evidence, if, in the charge, the judge gave such cautionary instructions to the jury in regard to it, as renders it reasonably certain that the jury did not base their verdict upon it, *this court will not reverse on account of* its introduction.

A party who seeks to reverse a judgment, for the introduction of evidence, must show not only that the evidence was erroneously received, but that it influenced the verdict against him.

In cases of fraud, where the precise question litigated depends upon a view of the whole evidence, the whole volume of proof should be brought up, and spread before the court on the paper-book. Per WOODWARD, J.

ERROR to the District Court of *Allegheny county.*

This was a *scire facias* on a judgment by William Speer for the use of H. Brunot against Lewis Peterson and Peter Peterson, entered on the 1st of June, 1841, for the sum of $1497.93. Brunot became bail for the defendants for the stay of execution. On the 2d February, 1843, the Petersons were both discharged as bankrupts. A portion of the judgment remaining unpaid, Brunot, the bail, paid it and took an assignment from the plaintiff, Speer, and brought this *scire facias* to revive it. The defendants pleaded payment and their discharge under the bankrupt law. The plaintiff replied, traversing the first plea and avoiding the second by alleging fraud and concealment of property in obtaining their discharge and certificates. The defendants traversed the facts alleged in this latter replication. A jury was called and sworn on the 20th March, 1856, and the questions presented arose on the admission of the evidence offered by the plaintiff to sustain the allegation of fraud and concealment of property.

The plaintiff alleged that Peter Peterson, at the time of his discharge, was the owner of two tracts of land in Allegheny county which were not included in his schedule—one of them known as the "Black Horse," and the other as the "Hatfield" property.

To sustain this allegation as to the first-named property, the plaintiff below gave in evidence a deed from Robert Peeples to Peter Peterson, R. C. Townsend, and Hugh McShane, dated the 21st July, 1835, conveying it to them. The tract contained 33

acres, and the consideration of the deed was $13,000. Also a deed from Samuel Gormley, assignee of Hugh McShane, to Peter Peterson, dated the 25th of March, 1841, for McShane's interest, for the consideration of $2000. It was further proved that Peter Peterson, after his discharge, continued to reside on this property and to exercise acts of ownership over it; that in 1848 and 1849 he made valuable improvements on it, putting an addition to the house and building a stable upon it, for all of which he paid; and that at the time he talked of making other improvements, and called the property his own.

The defendants below then gave in evidence a deed from Peter Peterson to Reese C. Townsend, dated the 14th April, 1841, for two undivided third parts of this property, which then contained 26 acres and 76 perches, there having been previously conveyed by Peterson and Townsend and wife, on the 31st March, 1841, to John Cameron, seven acres, for the consideration of $4200. The consideration of the deed from Peterson to Townsend was $2000, and was subject to the payment of $4600, a balance of the purchase-money due to Peeples. On the same day that the last-mentioned deed was executed, Peterson left it in the recorder's office for record, and when it was recorded, lifted it and receipted for it for Townsend.

The following sales were made of the Black Horse property, and deeds made by R. C. Townsend and wife, to the purchasers, viz. :—

On the 9th March, 1846, to Robert McIlheny of 7½ acres for the consideration of $3975.

On the 25th July, 1848, to John Cartwright, of 12 acres and 102 perches; consideration $5800.

On the 1st April, 1850, to C. H. Paulson, six acres, for the consideration of $3500.

These sales were made by Peterson and the purchasers brought to Townsend, who, with his wife, executed deeds to them.

It was proved by one witness that in making these sales Peterson acted as the agent of Townsend, but there was no evidence that any account of this agency had been kept by either party, or that there had been any settlements between them. Townsend died in 1851.

The Hatfield property, which is situated near Lawrenceville in Allegheny county, contains about six acres, and was conveyed to Peter Peterson by George A. Bayard on the 13th October, 1835, for the consideration of $4080.75. Peter Peterson conveyed it to Ann Peterson, his sister, by a deed, absolute on its face, dated the 23d December, 1839, for the consideration of $3500. On the same day he left the deed for record, paid the fees for recording it, $1.50, and on the 13th of January, 1840, lifted and receipted for

[Peterson v. Speer.]

it. When both this deed to Ann Peterson and the deed to Townsend, were executed, Peter Peterson was heavily indebted.

When Lewis Peterson applied for the benefit of the bankrupt act, in his schedule he returned two several tracts of land, situated near Tarentum in Allegheny county—one designated as the Salt Works tract and the other as the Hill tract. The former he described as containing 200 acres, with four salt wells upon it, only one of which was worth working, and valued it at $4000, subject to a mortgage to James Wood of $1300. The Hill tract adjoins the Salt Work tract, and was valued in the schedule at $1000.

The Salt Work tract was sold by the sheriff of Allegheny county on a *levari facias*, issued on a judgment on Wood's mortgage, to April Term, 1843, to John and Henry Irwin, for $3000; and a deed was executed and acknowledged, on the 6th day of May, 1843. Lewis Peterson moved on to this tract of land in 1841 or 1842, and lived on it at the time of his discharge as a bankrupt, and has continued to reside on it ever since. In the summer of 1843, immediately after his discharge and the sheriff's sale, Lewis Peterson commenced making extensive and valuable improvements upon this property, building a saw-mill and sinking salt wells, and purchased a steam engine at $1500, and in a few years expended ten or twelve thousand dollars in improvements. It was in evidence that in 1842–3 this tract was worth at least $10,000, that it would have been cheap at that, and that it was worth at the time of the trial, $40,000 or $50,000.

Notice was given to counsel for the plaintiff in error, under the provisions of the bankrupt law, that the foregoing facts would be offered in evidence, on part of the plaintiff below, on the trial of the cause.

The plaintiff on the trial, in the court below, having given in evidence a deed from George A. Bayard to Peter Peterson, dated October 1, 1835, for six acres of land in Collins township, called "Hatfield," and the schedule in bankruptcy, showing that it was omitted therefrom, they then offered the petition of Henry Sproul, the assignee in bankruptcy of Peter Peterson, March 6, 1849, praying for an order of sale of the Hatfield property, and the order of court therein in pursuance of said petition, to be followed by proof of sale and deed to vendee as the property of Peter Peterson; offered for the purpose of showing title in Peter Peterson in the Hatfield property at the time of his petition and discharge.

2d. To impeach the Ann Peterson deed, hereafter to be given in evidence.

3d. As introductory to Ann Peterson's declarations, showing that she had no title to the Hatfield property.

[Peterson *v.* Speer.]

To the introduction of which evidence, the defendants, by their counsel, objected,

1st. The evidence is incompetent.

2d. Irrelevant.

3d. That the acts of Peterson's assignee and the order of the court therein, six years after his discharge (it not appearing that Peterson had notice), are not evidence against him to impeach his discharge, or to show title in him to the property mentioned.

4th. That the deed from Bayard is better evidence of title than the petition and order of the court. .

The court overruled the objections, admitted the evidence, and the defendants excepted.

The plaintiff further offered, under exception by the defendants, and gave the following testimony, by William Stevenson, a witness on his behalf :—

"In the spring of 1845 I wanted to rent a place, and heard that Peterson had one to rent; had no acquaintance with Peterson. I saw him, and told him I heard that he had the place to rent. He said he had. I rented, and moved on to the place. After I was on it a short time, I heard that it did not belong to Peterson; that it belonged to Brunot; that he had bought it at sheriff's sale. I came to this place, and rented it from Mr. Brunot; some short time after I saw Mr. Peterson, it may be two weeks—I saw Mr. Peterson, and upbraided him with renting that which did not belong to him; that it might have got me into trouble. He said, if I had called with him there would have been no trouble about it. He said Mr. Brunot did not own that land, and never would. He said it belonged to the heirs of Henry Peterson, and the will would show it. He said the will was in the hands of some one; he named him, but I don't recollect. After they bought the land back from Mr. Brunot, I rented from Peterson. In all our transactions I never heard any other claim to the land but Lewis Peterson. I paid the rent to Lewis Peterson, and he always receipted for it in his own name. I went to pay him $6, the cost of the rent, and did not find him at the house. Him and Peter Peterson were about to buy the salt well, and I went off there. The conversation turned on the land from Mr. Brunot, and Peter remarked that he knew, for he had managed the business with Brunot; Lewis was present."

The plaintiff further offered, and the court admitted, under exception by defendant, the deposition of James Robertson, as follows :—

"I have been acquainted with Mr. Lewis Peterson for some years. Mr. Brunot I have never seen until lately. I reside in East Deer township, Allegheny county, about a mile and a half from Mr. Peterson; my age is sixty-seven past, on the 22d day of June last. The first time I ever saw Mr. Peterson, I called

[Peterson v. Speer.]

on him in Pittsburgh, to. know whether I might dig coal out of a run in a tract of land that went in Mr. Peterson's name. He told me that I might take coal, but I never took any of consequence. I was collector of taxes, and assessor for East Deer township, 1840. On this same tract of land there was a Joseph Thompson lived, and paid me the taxes. I think I assessed the land to those. Joseph Thompson and Edward pass as for Peterson's tenants. I think, probably in 1845, I was in conversation with Lewis Peterson, and I told him that I heard this same land which I had assessed to his tenants, belonged to Mr. Brunot. Mr. Peterson told me that Brunot bought the land as his property, but at the time Brunot bought it he could not hold it, because it was his (Peterson's) uncle's. He said that the land did not belong to him when it was sold, but to his (Peterson's) uncle; he did not name the uncle, that I recollect; it was about 1840 or 1841, that Mr. Peterson moved up there. But I can't say. I was supervisor in 1842, and I am sure he was there then, and he has resided there ever since; he does not reside on the farm about which I have been speaking, but on another tract. There have been extensive improvements made on the place where he resides, but I can't tell by whom."

The plaintiff again offered and proved, under a similar objection and exception, the following, by Sylvanus Lothrop:—

"I was present at the sale of the Hatfield property, six acres, opposite Allegheny cemetery. Sale by bankrupt assignee. Peter Peterson was present, but not bidding; had a friend with him who was, and the only person who was bidding besides himself, according to my recollection. There was conversation between the two parties constantly going on. I did not hear the conversation; they stood close together; I don't recollect the name of the person. I knew him then. I brought an ejectment on my title for the property purchased at the bankrupt sale." The record of the ejectment was here given in connexion with the testimony, as follows:—

SYLVANUS LOTHROP } No. 592, April Term,
v. } 1851. Ejectment for the
ANN PETERSON and PETER PETERSON. } Hatfield property. Served
by copy on Ann Peterson, April 11, 1851; served by copy on William Young, Nicholas Walter, tenants in possession, and also by copy on Peter Peterson, April 22, 1851. May 18, 1851, defendants plead not guilty. March 23, 1852, jury impannelled. March 27, 1852, verdict for plaintiff. March 29, 1852, defendants, by A. W. Loomis, their counsel, move for new trial in above case, for the reason that the verdict is against the law and the evidence, and the charge of the court. October 14, 1852, the court granted the defendants a new trial, upon payment of the

[Peterson *v.* Speer.]

costs of the term. June 19, 1854, continued. December 29, 1854, this suit discontinued and settled.

Thos. Williams, *Attorney for plaintiff*,
Per R. C. G. Sproul. December 29, 1854.

Attest: W. W. Campbell.

Witness proceeded as follows: "The defendants set up a deed from Peter Peterson to Ann Peterson, which was recorded. That was their defence. They made me a proposition, and I accepted it."

The plaintiff further offered to prove, by James T. Kinkead, that Ann Peterson, the sister of Peter, admitted to the witness that the consideration of $3500 in the deed from Peter to her was never paid by her, and that she did not know of the deed until long after it was made, nor until the witness informed her of it.

That some time after Peter was discharged as a bankrupt, and before Lothrop brought the ejectment, she declared she had no interest in the property except to the amount of six hundred dollars, to which amount Peter was indebted to her. But that subsequently she indicated a disposition to hold and claim the property; when requested to relinquish her claim upon being paid her debt of $600, declined to do so without first consulting her brother Peter.

This evidence was offered for the purpose of showing that the conveyance was fraudulent as to creditors; and that the title therefore still remained in Peter at the time of his application and discharge in bankruptcy, and being omitted from his schedule was a fraud on the bankrupt act, and a wilful concealment of his property.

It was objected to by the defendants as irrelevant, but admitted by the court, and thereupon the defendants excepted.

The jury found a verdict for the plaintiff for $1630.25. A motion for a new trial was overruled, and judgment entered upon the verdict.

The defendants thereupon purchased this writ, and assigned for error here that the court below erred in admitting the evidence contained in the foregoing five bills of exceptions.

*A. W. Loomis*, for plaintiffs in error.

*T. Mellon* and *J. E. Brady*, for defendant in error.

The opinion of the court was delivered by

Woodward, J.—This was a *scire facias* to revive a judgment which William Speer obtained on the 1st June, 1841, against the defendants below, now plaintiffs in error. H. Brunot having paid

[Peterson *v.* Speer.]

the judgment and taken an assignment of it, the *scire facias* was sued out in the name of Speer to his use. The defendants pleaded 1. Payment, and 2. Their discharge under the Bankrupt Law of 19th August, 1841. What payments they had made were admitted and applied to the judgment, and on the trial no question was agitated under this plea.

To the plea of discharge under the bankrupt law, the plaintiff replied in substance *per fraudem*, that the defendants obtained their certificates by wilful concealment of their property and rights of property, contrary to the Act of Congress, and they gave, as required by the Act of Congress, the "prior reasonable notice, specifying in writing the fraud and concealment."

The question raised by the pleadings, and tried in the court below, was therefore a pure question of fact—fraud or no fraud in obtaining their discharge as bankrupts. The learned counsel for the plaintiffs in error seemed to think there was something peculiar about the question of fraud in this case, and insisted with great energy that it was not enough to make out fraudulent transfers of property by the defendants, but that under the pleadings nothing but a fraud *contrary to* the Act of Congress would suffice, and hence he argued that no applicant for the benefit of the bankrupt law, after having been prostrated by misfortune, after having applied for relief under the provisions of the act, after having complied with its severe and rigid requirements, having surrendered his property for the benefit of his creditors, having finally obtained his discharge from all his debts, by the solemn decree of a court of exclusive jurisdiction, ample means having been afforded to his creditors to resist his progress at every step, and prevent his success, by the introduction of any legitimate sufficient proof, ought, years afterwards, to be deprived of the benefit of that discharge, and branded with fraud and infamy by the utter disregard, in the administration of justice, of the provisions of the very law under which it was granted. Such a course, he suggested, is a marked disrespect to the tribunal whose solemn judgment is defeated, a palpable violation of the law whose universal obligation is derived from the express provisions of the Constitution of the United States, and a grievous wrong and irreparable injury to the suitor whose rights are sacrificed.

These are grave suggestions, and if well founded they make an end of this case and of all others which involve similar questions of fraud. It is worth while therefore to consider these views carefully, before entering into an examination of the bills of exception on the record.

The bankrupt law of 1841 was a constitutional enactment by the Congress of the United States. The power to establish uniform laws on the subject of bankruptcies throughout the United States, is expressly conferred on Congress by the federal constitu-

[Peterson *v.* Speer.]

tion; and although it is not exclusive in the terms of grant, it becomes so when it is exercised. Uniform laws throughout the United States, on any subject, must of course supersede state legislation on the same subject. The states may make bankrupt laws when the general government has none, but when Congress passes such an act, it becomes the supreme and exclusive as well as uniform law.

The Act of 1841 gave the federal courts exclusive jurisdiction in cases of bankruptcies, and provided, in the 4th section, that every bankrupt who should *bona fide* surrender all his property and rights of property, for the benefit of his creditors, and should comply with all orders of the appropriate court, should be entitled to a full discharge from all his debts, to be decreed and allowed by the court which has declared him a bankrupt, and a certificate thereof granted to him by such court accordingly.

But after the decree of bankruptcy, and before such certificate should issue, notice was to be given to the creditors, as specifically prescribed, and if such bankrupt shall be " guilty of any fraud or wilful concealment of his property or rights of property, or shall have preferred any of his creditors, contrary to the provisions of this act, * * * * * * or shall, in the proceedings under this act, admit a false or fictitious debt against his estate, he shall not be entitled to any such discharge or certificate."

Here it will be observed that the fraud which was to deprive the bankrupt of his certificate, even after the court had decreed him a bankrupt, was such as should be established to the satisfaction of the court having him in charge, after seventy days' notice to his creditors; but if none was established in that court, the certificate was then to issue, and that was to be deemed, in all courts of justice, a full and complete discharge of all debts, contracts, and engagements of such bankrupt, and a full and complete bar to all suits brought in any court of judicature whatever; "and the same shall be conclusive evidence of itself in favour of such bankrupt, unless the same shall be impeached for some fraud or wilful concealment by him of his property or rights of property *as aforesaid*, contrary to the provisions of this act, on prior reasonable notice, specifying in writing such fraud or concealment."

These words, " unless impeached for some fraud or wilful concealment as aforesaid," clearly point to the frauds and concealments which may prevent the granting of the certificate after the decree, and there the expression is, as we have seen, " any fraud or wilful concealment of property or rights of property."

Now, whilst it is true that the federal courts alone can grant the certificate of discharge, and that when granted all other courts are to give it conclusive effect, unless so impeached, yet such other courts possess the same power to try the impeachment as the court decreeing the bankruptcy possessed to try the right to the certifi-

[Peterson v. Speer.]

cate. In the one court the bankrupt was not to obtain his certificate if convicted of fraud or concealment, in the other it was not to avail him. It is no reflection on the federal courts then, and no violation of the Act of Congress, for a state court to try an alleged fraud in obtaining a certificate of bankruptcy. Nay, it is agreeable to the very letter and spirit of the enactment. Congress have said it may be tried—the very fraud which might have been litigated in granting the certificate. They knew well that in the manner bankrupt cases are ordinarily driven through the courts, many fraudulent concealments might elude detection which time and subsequent circumstances would uncover. They meant to afford absolute protection in every court of judicature to the honest debtor, who had *bona fide* surrendered his all to his creditors, but no immunity whatever to him who had practised fraud and concealment, not only to the prejudice of his creditors, but to the dishonour of the laws and courts of his country.

What, then, is the peculiarity of the fraud alleged in this case? None, except that it involves disloyalty to the government whose protection is invoked. It is actual fraud, as contradistinguished from those legal or constructive frauds, which, for the benefit of creditors, we sometimes impute to transactions perfectly fair in themselves, and obligatory on the immediate parties; but it is nothing more nor less than actual fraud. It is actual fraud contrary to the provisions of the Act of Congress. It is limited to the occasion of obtaining their discharge under that law. It is the imputation of *mala fides* where that law demanded *bona fides*. If a man procure a release from his creditor, on a false exhibition of assets, it is a fraud ; if a man cancel all his debts, by proceedings in bankruptcy, founded on suppressions and false statements, it is the same thing in kind, and differs only in the degree of turpitude.

The counsel was mistaken, then, in supposing that there was something peculiar about the fraud to be made out under this bankrupt act, which required any more or more peculiar evidence than to make out any other fraud in fact. Fraud vitiates judicial proceedings as well as others. It was an early aphorism of the law, that fraud and crime vitiate every title, and even right itself is turned into wrong by circumventing to obtain it. In no case is fraud to be presumed ; but in every case where it is alleged, it may not only be established by express proof, of which, from its nature, it is very seldom capable, but it may also be inferred, if the inference be a necessary consequence from the act done: Aston v. Aston, 1 *Vesey* 268.

Such was the question of fact, and such the rule of proof on which the parties went to trial. The cause was very carefully and fully tried. After admitting a mass of documentary and parol proofs, the learned judge charged the jury in a manner so satisfactory to both parties, that neither of them took a single

[Peterson *v.* Speer.]

exception. Of course, we have not the charge upon the record, but because it is not brought there by exception, we are bound to presume that it was exactly what it ought to have been. After verdict against the defendants, the court reviewed the evidence, on a motion for a new trial, and decided that it was competent to go to the jury, that they had dealt with it fairly, and that it did not so clearly preponderate in favour of the defendants as to enable the court to say the verdict was against the weight of evidence, and accordingly judgment was entered on the verdict more than eleven months after it was rendered.

The case is now here on bills of exception to evidence, and it is a circumstance worthy of notice that they are all founded on evidence admitted—not on any that was rejected. The transactions drawn into investigation were long past, and some of them very much complicated. The defendants complain, not that the court refused to let the jury hear all the explanations they had to make, but that they were permitted to hear such explanations as the plaintiff was able to furnish. In a case involving a mere question of fact, a case thus tried and reviewed by a very competent judge, and thus presented on a writ of error, nothing less than a manifest and palpable error, in admitting some piece of evidence which was of a nature to influence the result, would justify a judgment of reversal in this court. If any of the evidence in the bills of exception was admitted in violation of rules of law, and if it was of a quality to injure the defendants, they are entitled to a reversal of the judgment.

Is there any such error in the record?

We have not, on our paper-books, the date of the application of the defendants for the benefit of the bankrupt law, nor the schedules and papers which were filed in that proceeding, but we are informed that they obtained their discharge on the 2d day of February, 1843. In the plaintiff's notice of special matter, on which he would rely for impeaching that discharge, he set forth, first, as to Peter Peterson, that when in failing circumstances, and in prospect of bankruptcy, and shortly before becoming a bankrupt, he conveyed a certain valuable piece of land, called Hatfield, near Lawrenceville, in Allegheny county, to his sister, Ann Peterson, without consideration, in order to conceal it from his creditors, and in order that the legal title might be held by her in secret trust for him, the said Peter, until after his discharge as a bankrupt, and that he made no return of this land in his petition or schedule.

In support of this allegation the plaintiff offered in evidence a deed of George A. Bayard to Peter Peterson, dated 1st October, 1835, for this land, in consideration of $4080.75; a decree of the District Court of the United States, founded on the petition of the assignee in bankruptcy, for sale of it; a sale by the

assignee, and a deed dated 19th April, 1849, to Sylvanus Lothrop, for $470; an action of ejectment by Lothrop against Ann and Peter Peterson, in the District Court of Allegheny county, to April Term, 1851, in which, on trial, a verdict was rendered for plaintiff 22d March, 1852, which was set aside, and new trial granted to defendants on terms, on the 14th October, 1852, and an entry of December 29, 1854, by plaintiff's attorney, "this suit discontinued and settled."

He also proved that Lothrop was a creditor of Peterson; that the defendants set up, on the trial of the above ejectment, the deed of Peter to Ann as their defence, and that after a new trial was granted they made him a proposition and he accepted it. After the defendants, on the trial of the present case, had given in evidence that deed of Peter to Ann, dated, acknowledged, and recorded on the 23d December, 1839, reciting a consideration of $3500, the plaintiff proved, by James T. Kinkead, that Ann admitted to him the consideration expressed in the deed was never paid; that she did not know that said deed had been made to her till long after it was made, nor until the witness himself informed her of it; that after Peter was discharged as a bankrupt, and before Lothrop's ejectment, she declared she had no interest in the property, except to the amount of $600; that Peter owed her that amount. It was further in proof that Peter received the deed from the recorder; that Ann lived with him, and that Lothrop was an endorser for the Petersons to the amount of $4000 or $5000, from 1839 to 1842.

These were the material facts proved, in regard to the fraudulent concealment of Peter's right of property in the Hatfield tract. I have grouped them together for the purpose of rendering intelligible two remarks: 1. That they were facts eminently fit to be submitted to a jury, on such an issue as was formed here. A valuable property, in the vicinity of a large and growing city, worth, in 1835, over $4000; conveyed to a sister, without her knowledge, four years thereafter, in consideration of $3500, not more than $600 of which was paid; possession retained, and apparent ownership unchanged; no evidence of the delivery of the deed, except the recording of it, which was not conclusive: Chess *v.* Chess, 1 *Penna. Rep.* 32: and a solemn denial of any interest in the property, by failing to return it when applying for the benefit of the bankrupt law; these, I say, were circumstances worthy of the grave consideration of a jury, on a question of the *bona fides* with which this bankrupt had made return of his property and rights of property. It was not for the court below, it is not for this court, to say that they were sufficient to fix the stain of fraud on the defendant's proceedings; but it is our duty to say that it would have been error to withhold them from the jury.

2. The other observation is, that there is no merit in the first,

[Peterson *v.* Speer.]

fourth, and fifth bills of exception, which include detached portions of this evidence. The first bill of exceptions relates to the order of sale, on the petition of the assignee. It is objected that the assignee set forth that *he had been informed* that Peter Peterson had, at the time of his discharge, an interest in the Hatfield tract. The counsel thinks there should have been a more express averment of an interest.

But it must be remembered that the plaintiff was not making out title as in ejectment. There was the decree of the court ordering the sale, and a subsequent compromise with the purchaser at that sale, which were the pregnant facts bearing on the actual issue trying. No matter whether the petition of the assignee was full or not; no matter whether the court had jurisdiction to decree the sale: it *was* decreed, and the compromise followed. As a part of the *res gestæ*, all this was evidence. The court said the order of sale was some evidence of title, and if we should apply the stringent rule of construction claimed for the decree of the same court, in awarding the certificate of bankruptcy, it would be necessary to say it was very high evidence of title. The same learned counsel who told us that to question a decree of the federal court discharging a bankrupt, was a marked disrespect to the tribunal whose solemn judgment is defeated, and a palpable violation of the bankrupt law, though that law expressly authorizes us to question it, does himself vehemently question the solemn judgment of the same tribunal, in decreeing a sale of part of the bankrupt's estate. He complains of the judge for saying that the latter decree, where no power of review is granted to the state courts, was *some* evidence of title. We do not mean to apply the stringent rule suggested by the counsel, nor even to justify the remark of the court that the decree was some evidence of title, for we hold that the evidence was properly admitted as part of the *res gestæ*. It was in proof that Peterson attended the sale, and had a friend bidding for him.

The fourth bill of exceptions relates to the testimony of Lothrop, and his ejectment and settlement; the fifth, to the testimony of Kinkead. Nothing can be more obvious than that this evidence was proper and essential in exploring a transaction arraigned for fraud. How is fraud ever to be detected, if you may not trace it through its sinuosities, and show how it has intrenched itself in regular conveyances and legal forms; how it has made an innocent party an unwilling accomplice; and how insincerely the intention has corresponded with the action. Did Peter Peterson make a *bona fide* surrender of his rights of property to his creditors? This was the question, and the evidence in these bills of exception was pertinent.

But it is argued that the assignee's sale did not prove it; nor Lothrop's ejectment; nor Ann's confessions to Kinkead. This

[Peterson v. Speer.]

must be conceded, but in the same sense in which we would concede that neither this link, nor that link, nor the other link is a chain.   The facts in these bills, isolated and alone, were nothing; but connected together by the other facts in proof, not excepted to, they bound the conscience of the jury, and that binds us.

The counsel seems to suppose that if Peter made the deed to his sister for the purpose of defrauding creditors, and on a secret trust for his own benefit, it could not be a fraud against the bankrupt act, which was not in existence at the date of the conveyance. Certainly not.   The making of the deed was not the fraud on the bankrupt act; but if it was fraudulently made, or if never delivered, it did not divest Peter's title; and when he filed his schedule he should have included whatever interest, legal or equitable, he had in this property.   The fraud against the bankrupt act, if any, consisted in suppressing and concealing that interest.   This, it was alleged, he did by means of the conveyance made a few years before.   The time when the cloak was fabricated was not very material: the question was as to the use he made of it.

As to the competency of Ann Peterson's declarations, the authorities cited by the counsel of the defendant in error are ample proof.   If there was no evidence of her original complicity in the alleged fraud of her brother, there was after she learned from Kinkead of the conveyance in her favour; for he swore that subsequently when he interrogated her, she indicated a disposition to hold and claim the property; and when he asked her if she would relinquish her claim to it, in favour of Lothrop, upon being paid her $600, she said she could not do so without consulting her brother Peter.   The least degree of concert or collusion between parties to an illegal transaction, makes the act of one the act of all, and the acts and declarations of one may be given in evidence to affect the others.   This was the language of Judge Rogers, in Gibbs v. Neely, 7 *Watts* 307, where the question was on the admissibility of declarations as well as acts, though he erroneously cited Rogers v. Hall, 4 *Watts* 359, where the ruling related not to declarations but to acts.   The rule in its largest sense is, however, part of the law of conspiracy, and has frequently been recognised as such in this court: 11 *Harris* 325; 2 *Casey* 84.

I come now to the second and third bills of exception, which contain the evidence against the other defendant, Lewis Peterson, that is complained of.   This part of the case is very intricate and very peculiar.   I will endeavour to state it intelligibly.   Lewis Peterson, when he became a bankrupt, was the owner of two pieces of real estate, one known as the Hill tract, and the other as the Salt Works tract, on the Allegheny river.   He returned both these tracts in his schedule, valuing the first at $1000, and the other at $4000.   The plaintiff charged that he fraudulently undervalued them; that he concealed the title to the Hill tract, and

pretended that he had no other title than a possessory right, which he expected would, in a few years longer, by adverse possession, become absolute; that the actual legal title was in one Henry Peterson's heirs, to whom it had been devised by his uncle, Derrick Peterson, when in truth and fact the said Lewis had in his possession a deed to himself in fee from his uncle, Derrick Peterson, which he never placed on record, nor delivered to his assignee, but wilfully and intentionally concealed said deed, for the purpose of enabling himself, after his discharge as a bankrupt, to repurchase said farm at an undervalue, which object, by means of said fraudulent practices, he afterwards accomplished.

There were other specifications touching the Salt Works tract, and evidence tending to show that the title to this tract, on which he resided when he was discharged, soon found its way back into the hands of two friends and relatives of his, by virtue of a sheriff's sale, on an existing encumbrance, and that shortly after he commenced making valuable improvements on the tract—built a brick dwelling-house, at a cost of from $2000 to $3000—bored salt wells and erected works, at a cost estimated at some $5000 or $6000. It was alleged also that he had made statements which prejudiced the sheriff's sale of this tract, whereby his friends were enabled to purchase it at $3000, and that he had concealed from his creditors personal property, money, and securities; but as none of the evidence relating to this tract was excepted to, it is not here for review, and I confine my attention to that which is in the bills of exception, and all of which relates to the Hill tract.

This tract was sold at sheriff's sale, 23d July, 1844, to Hilary Brunot, for $510, by virtue of process on a judgment which was a lien before Peterson's discharge, and which was not, of course, impaired or affected by that event. There was no suggestion that Brunot was in complicity with Peterson, so that this would seem to have been a fair sale, and to have vested the title in Brunot. But in the spring of 1845, Peterson declared to Stevenson and Robertson that Brunot did not own the land, and never would; that it belonged to the heirs of Henry Peterson, and the will would show it; that Brunot bought the land as his (Lewis Peterson's) property; but at the time he bought, it was his uncle's.

This is the evidence particularly objected to in these bills of exceptions. It is denied that these declarations could possibly import any fraudulent intent, two years before, in obtaining the certificate of discharge. And I confess I do not see how they could, not even in connexion with the subsequent transactions explained by the other evidence of the plaintiff, and which was not objected to. It seems from that evidence that Thomas Donnelly, having a judgment against Henry Peterson's administrators, and hearing that Lewis alleged the title to belong to Henry's estate, seized it in execution, and bid it in at a sheriff's sale for $45, and

[*Peterson v. Speer.*]

brought his ejectment against Stevenson, the tenant in possession. The counsel for plaintiff supposes this reduced Lewis to a distressing alternative. If he stood by and allowed Donnelly to recover against Brunot's tenant, that would establish the Henry Peterson title. If, for the purpose of defeating Donnelly, he produced from his pocket the deed of Derrick Peterson, under whose will Henry claimed, it would establish Brunot's title. Either way the cloud which it is supposed he wanted to keep over the title, would be dissipated. Accordingly, on the 14th December, 1847, the day before the Donnelly ejectment was to be tried, Henry Irwin, a son-in-law of Peterson, bought up the Brunot title, for $510, and on the trial Lewis was examined as a witness to prove the deed from Derrick to himself, and Donnelly was forced into a nonsuit.

I cannot see that all this threw any light on the *bona fides* of Lewis's proceedings in bankruptcy. Then it was error to admit the evidence that was excepted to, says the counsel. Grant it; but did the error damage the defendant? That depends on the instructions of the court. Now, although we have not the charge on our paper-books, the plaintiff's counsel give us what is not denied to be authentic extracts from it, as follow.

" If the petitioner did not undervalue his property with a fraudulent intent, to gain some private advantage to the injury of his creditors; if he honestly, though mistakenly, valued it at what he thought it was worth, or would bring at a cash sale, then he was guilty of no such fraud in undervaluing his property as will impeach his discharge. To determine this question, the jury will consider all the facts in the case bearing upon this question.

" There can be no fraud without a dishonest purpose or intent, and that dishonest purpose and intent must have been in Peterson's mind, and entertained by him, when he prepared the inventory, and filed his petition.

" A dishonest purpose or intent, formed and entertained for the first time *after* his discharge, cannot affect the validity of the discharge."

And again: " As to the concealment of the title to the Hill Tract—The defendant was not bound to return his title in the inventory of his real estate, and he was not bound to surrender his title to his assignee in bankruptcy, unless it was required. If the assignee required it, he would be bound to disclose his title in good faith; and if he wilfully and fraudulently refused to disclose his title, or to surrender the same, that would prevent or vitiate his discharge. But such concealment must be wilful and fraudulent. Does the evidence then satisfy the jury that Lewis Peterson concealed his title to the Hill Tract from the assignee, or that he wilfully refused to disclose or surrender it, and that he did this dishonestly and fraudulently.

" Any concealment of his title to the Hill Tract, or any false

[Peterson *v.* Speer.]

representations in regard to the same, made after his discharge as a bankrupt, and the sale of his property by the sheriff, would not invalidate his discharge,—unless such concealment and false representations were made. before his discharge, and made for a fraudulent and dishonest purpose, they cannot invalidate the discharge."

These cautionary observations on this evidence, amounting almost to a withdrawal of it, render it morally certain that the jury did not base their verdict upon it.   If it was apparent that they did, the judgment would have to be reversed, for that evidence, however it may be viewed, was inadequate to support a verdict so serious in its consequences.   And it is manifest, from what has been said about the Salt Works tract, that there was other evidence in the cause, from which the fraud imputed to Lewis Peterson might have been found.   But that evidence, it may be said, is not before us.   It is not, and therein the case is very defectively presented.

But the elaborate opinion of Judge WILLIAMS on the motion for a new trial is furnished, and that informs us of the course of the trial, and of the character of the evidence given, in reference to the occupancy and improvements of the Salt Works tract.   He did not doubt that the verdict was based on this evidence, nor do we. We do not mean to say that his opinion on the point would cancel the error of admitting the exceptionable evidence in regard to the Hill tract.   There was but one way he could cure that error, and that was by so controlling it, in the charge, as to render it harmless; and this I have shown he did.   Seeing then that the only error pointed out in the record was not permitted to injure the defendants, and that there was other evidence not excepted to, from which the verdict might have been formed, the plaintiffs in error have no right to demand a reversal at our hands.

A few words more about Judge WILLIAMS's opinion on the motion for a new trial, and I shall be done with this troublesome case.

That opinion is not brought up by any bill of exceptions, and strictly speaking it is not, perhaps, any part of the record; but here it is, and no fact or circumstances alleged in it, by way of explanation of the trial, is questioned.   The plaintiffs in error bring up only so much of the evidence as they complain of, and the defendant in error, while he supplies part of the residue, does not present the whole of it, but instead of doing so presents the judge's summary of it.   This is not a practice to be encouraged. In this case, as in almost all cases of fraud, the judgment of this court upon the precise questions litigated here, depends necessarily very much on a view of the whole evidence.   In all such cases the whole volume of proofs should be spread before us.   If the plaintiffs in error do not furnish it, the defendant should.

[Peterson *v.* Speer.]

Getting at the core of this case in the best way we can from all that our paper-books contain, we conclude that it was a mere question of fact, and that no such error was committed on the trial as calls for our interposition.

The judgment is affirmed.